[No. D008786. Fourth Dist., Div. One. May 30, 1989.]

CENTER FOR PUBLIC INTEREST LAW et al., Petitioners, v.
FAIR POLITICAL PRACTICES COMMISSION et al., Respondents.

**COUNSEL**

Robert C. Fellmeth, Julianne B. D'Angelo and James R. Wheaton for Petitioners.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Richard M. Frank, Deputy Attorney General, Diane M. Griffiths, Kathryn E. Donovan, Scott Hallabrin, Jeevan Ahuja, Margarita Altomirano, John G. McLean and Lilly Spitz for Respondents.

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., Hallisey & Johnson, Jeremiah F. Hallisey and Don B. Kates, Jr., as Amici Curiae.

**OPINION**

**TODD, J.**—The Center for Public Interest Law and Assemblyman John Vasconcellos (collectively, the Center) have petitioned for a writ of mandamus by which they seek to set aside a formal opinion of the Fair Political Practices Commission (FPPC). The FPPC opinion found certain provisions of the "Campaign Spending Limits Act of 1986,"[1] Proposition 68 on the June 1988 ballot, ineffective because they conflict with the "Campaign Contribution Limits Without Taxpayer Financing Amendments to the Political Reform Act,"[2] Proposition 73 on the June 1988 ballot.[3] As will be seen, the provisions of Proposition 68 at issue here[4] are in conflict with Proposition

---

[1] See Government Code section 85100, as added by Proposition 68.

[2] See Government Code section 85100, as added by Proposition 73.

[3] The Center first sought relief from this court by a petition for writ of mandamus and emergency stay filed September 28, 1988. We denied the petition on October 24, 1988. Thereafter, the Center sought relief from the California Supreme Court, which on December 15, 1988, granted the petition for review and issued an order directing us to issue an alternative writ. On December 21, 1988, we issued an order (as mod. on Jan. 17, 1989) to the FPPC to grant the relief prayed by the Center or show cause why such relief should not be granted. The Center and the FPPC have filed supplemental briefing and we have heard oral argument.

[4] At issue is article 5 of the "Campaign Spending Limits Act of 1986," commencing with section 85500 of the Government Code, as well as Revenue and Taxation Code sections 18775 and 18776, as added by Proposition 68.

73, and, therefore, those provisions are inoperative since Proposition 73, which received a greater number of votes, prevails.

## FACTS

At the June 7, 1988, statewide primary election the people adopted two initiative measures—Propositions 68 and 73—which address campaign finance reform. Both measures amend the Political Reform Act of 1974 by adding a new chapter 5 (commencing with § 85100) to title 9 of the Government Code.[5] Proposition 68 also amends the Revenue and Taxation Code to require the Franchise Tax Board to modify personal tax returns to implement a "Campaign Reform Fund" to which taxpayers can voluntarily designate up to $3 of their income tax liability to finance state legislative races. (§ 85102, subd. (e), as added by Prop. 68, and Rev. & Tax. Code, § 18775, as added by Prop. 68.) Proposition 73 received more affirmative votes than Proposition 68. On August 3, 1988, the FPPC received a request, pursuant to section 83114, subdivision (a), for a formal opinion on whether any provisions of Proposition 68 survive in light of the passage of Proposition 73 by a greater number of votes.[6] The FPPC granted the opinion request on August 16, 1988, and the FPPC legal staff prepared a memorandum addressing the issues and recommending an interpretation. (For procedures FPPC must follow in issuing a formal opinion, see Cal. Code Regs., tit. 2, § 18322.) A public hearing concerning the requested formal opinion was held September 22, 1988, and, at the conclusion of the hearing, the FPPC (1) accepted the staff's conclusions and (2) made a finding that the Campaign Reform Fund and the tax check-off system in Proposition 68 do not survive. The staff prepared a draft opinion, *In re Bell* (1988) 11 FPPC Ops. 1, which the FPPC adopted at a public hearing on November 9, 1988. (See Cal. Code Regs., tit. 2, § 18322, subd. (e).)

## DISCUSSION

### I

■ The key issue in this writ proceeding is whether provisions of Proposition 68, specifically those establishing the Campaign Reform Fund, conflict with provisions of Proposition 73. One of the explicit purposes of Proposition 68 was to provide a "neutral source of campaign financing by allowing individual taxpayers voluntarily to dedicate a portion of their state

---

[5] All statutory references are to the Government Code unless otherwise specified.

[6] The request for a formal opinion was made by Charles H. Bell, Jr., chairman, and Lance H. Olson, secretary, of the California Political Attorneys Association, a group of attorneys whose practices involve representing clients with respect to the Political Reform Act of 1974.

taxes to defray a portion of the costs of legislative campaigns." (§ 85102, subd. (e), as added by Prop. 68.) To implement this purpose, Proposition 68 establishes a tax check-off system allowing each taxpayer to designate up to $3 of his or her income tax liability to be deposited in the Campaign Reform Fund, these moneys to be distributed to legislative candidates who agreed to abide by specific campaign spending limitations. (Rev. & Tax. Code, § 18775,[7] as added by Prop. 68.)

Proposition 73 expressly prohibits the expenditure and acceptance of "any public moneys for the purpose of seeking elective office." (§ 85300, as added by Prop. 73.) Thus, the question boils down to whether Proposition 68's system of campaign funding using a portion of taxpayers' tax liability conflicts with Proposition 73's prohibition of public funding for campaigns.

There is no dispute on the appropriate legal standards to apply here. Article II, section 10, subdivision (b), of the California Constitution provides: "If provisions of 2 or more [initiatives] approved at the same election conflict, those of the measure receiving the highest affirmative vote shall prevail." Thus, to the extent of any conflict in their provisions, Proposition 73 prevails over Proposition 68.

In *Estate of Gibson* (1983) 139 Cal.App.3d 733 [189 Cal.Rptr. 201], the Court of Appeal analyzed two initiatives that repealed the state inheritance tax, but specified different effective dates for the repeal. ■ The court in *Gibson* concluded the two measures were in conflict and noted the general rule: "It is a cardinal rule of statutory construction that statutes relating to the same subject matter must be read together and reconciled whenever possible. . . . This rule applies to initiative measures enacted as statutes as well as to acts of the Legislature. . . . However, in case of an irreconcilable conflict between the provisions of two or more measures approved at the same election, California Constitution, article II, section 10, subdivision (b) provides that 'those of the measure receiving the highest affirmative vote shall prevail.'" (*Id.* at p. 736, fn. omitted.)

■ For the following reasons, we conclude there is an irreconcilable conflict between Proposition 68's provisions establishing the Campaign Re-

---

[7] Revenue and Taxation Code section 18775, as added by Proposition 68, provides in part: "Every individual whose income tax liability for any taxable year is three dollars ($3) or more may designate an amount up to three dollars ($3) of that tax liability to be deposited into the Campaign Reform Fund. In the case of a joint return of husband and wife having an income tax liability of six dollars ($6) or more, each spouse may designate that an amount up to three dollars ($3) of that tax liability shall be paid to the Fund. Taxpayer designations of funds shall not increase that taxpayer's tax liability. Money in this Fund shall be available for distribution in accordance with the provisions of Chapter 5 of Title 9, commencing with Section 85100 of the Government Code."

form Fund and Proposition 73's ban on the expenditure and acceptance of public moneys in campaigns.

A.

Proposition 73's ban on public money in elections is clear. Section 85300, as added by Proposition 73, states: "No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office." Proposition 73 also contains a provision that defines various terms used in the measure, including "public moneys." " 'Public moneys' has the same meaning as defined in Section 426 of the Penal Code." (§ 85102, subd. (e), as added by Prop. 73.) Penal Code section 426 provides: "The phrase 'public moneys,' as used in Sections 424 and 425 [of the Penal Code dealing with embezzlement and falsification of accounts by public officers and misappropriation of 'public moneys' and failure to pay over 'public moneys'], includes all bonds and evidence of indebtedness, and all moneys belonging to the state, or any city, county, town, district, or public agency therein, and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity." (Italics added.) Is the portion of a taxpayer's tax liability that is voluntarily designated under Proposition 68 to go to the Campaign Reform Fund "public moneys" as defined in Penal Code section 426? We conclude it is.

First, Penal Code section 426's definition of "public moneys" is phrased in inclusive language so the definition is met if the money either belongs to the state *or* is received or held by a state officer acting in his or her official capacity.

With respect to whether the money collected for the Campaign Reform Fund belongs to the state, it clearly does. The Campaign Reform Fund is funded by the tax check-off created by Revenue and Taxation Code section 18775, as added by Proposition 68. The funding results from the taxpayer's voluntary designation of $3 of his or her tax liability. Thus, the $3 that goes into the Campaign Reform Fund derives from the individual's tax liability; if the individual had no tax liability, he or she could not designate $3 to be allocated to the Campaign Reform Fund. Whether or not the taxpayer opts to make this designation, his or her tax liability remains unchanged. Revenue and Taxation Code section 18775, as added by Proposition 68, provides in pertinent part: "Taxpayer designations of funds shall not increase that taxpayer's tax liability." The same section also provides that immediately after the Campaign Reform Fund tax check-off portion of the personal tax return the following language must be printed: "NOTE: Checking 'YES' will

not increase the taxes you pay or reduce your refund." (Rev. & Tax. Code § 18775, as added by Prop. 68.)

Clearly, Revenue and Taxation Code section 18775, as added by Proposition 68, does not allow the individual taxpayer to contribute his or her private money to the Campaign Reform Fund but rather allows the taxpayer to designate or direct that $3 of his or her tax liability (which is money or evidence of indebtedness and hence "public moneys" under Pen. Code, § 426) to a specific state purpose. The designated $3 goes to the Campaign Reform Fund rather than the General Fund, where it could be used for a myriad of government purposes. But the fact that it is designated and therefore allocated to the Campaign Reform Fund rather than the General Fund does not change the character of the tax money from a public one to a private one.[8]

The Center claims the voluntary designation of a portion of the taxpayer's tax liability is a tax credit and therefore does not belong to the state or any other public entity. We disagree because the premise—that it is a tax credit—is wrong. Tax credits are amounts that are subtracted from the net tax (computed by applying the tax rates to taxable income) to reduce the amount owed by the taxpayer. (See Rev. & Tax. Code, § 17039.) The voluntary designation of $3 of the taxpayer's tax liability does not alter the taxpayer's liability in any fashion; whether or not the taxpayer voluntarily checks off "yes" to the question regarding $3 going to the Campaign Reform Fund, the individual's tax liability will not be increased nor will his or her refund be decreased. (See Rev. & Tax. Code, § 18775, as added by Prop. 68.) What Revenue and Taxation Code section 18775, as added by Proposition 68, does is allow the taxpayer to direct that $3 of his or her tax liability will be spent to fund legislative campaigns rather than be placed in the General Fund where it would help finance other state-funded programs such as law enforcement, health care, etc. Since Proposition 68 merely allows the taxpayer to redirect $3 of the taxes owed from the General Fund to a specific fund (the Campaign Reform Fund), the conclusion is inescapable that the measure involves public moneys.[9]

---

[8] Revenue and Taxation Code section 18776, as added by Proposition 68, also supports our characterization of the Campaign Reform Fund as "public moneys." The section provides: "All money over $1 million, adjusted for cost of living changes, remaining in the Campaign Reform Fund as of January 31 in the year following a general election shall be refunded to the General Fund."

[9] The Center's reliance on *People* v. *Johnson** (Cal.App.) is not well placed. *Johnson* involved highway patrol officers who removed money from the wallets of motorists stopped for speeding. It is clearly distinguishable; under no reasonable theory could the motorists' money be deemed public money.

---

*Reporter's Note: Opinion (F006798) deleted upon direction of Supreme Court by order dated October 22, 1987.

With respect to the second definition of "public moneys" contained in Penal Code section 426—namely, money received or held by state officers in their official capacity—we also conclude the tax check-off system created by Proposition 68 establishes a Campaign Reform Fund that consists of "public moneys." Revenue and Taxation Code section 18554 provides tax payments shall be paid to the Franchise Tax Board. Nothing in the language of Proposition 68 indicates that payment of the designated $3, along with the remainder of the taxpayer's tax liability, should not be governed by Revenue and Taxation Code section 18554. Thus, the $3 is money received by state officials in the course of their regular official duties. Furthermore, section 85505, as added by Proposition 68, provides the state Controller shall make payments from the Campaign Reform Fund in amounts certified by the FPPC. Again, the Controller would be acting in his official capacity.

The Center relies on *People* v. *Showalter* (1932) 126 Cal.App. 665 [14 P.2d 1034] to argue the Campaign Reform Fund does not consist of public moneys because a receiver could be hired to administer the fund rather than have public officials administer it. In *Showalter,* the court held a court-appointed receiver was not a "public officer" and the moneys held by him in the course of his duties were not "public moneys" within the meaning of Penal Code section 426. (*People* v. *Showalter, supra,* 126 Cal.App. at pp. 668-669.) The Center's reliance on *Showalter* is misplaced. First, it presupposes that a receiver could or would be appointed to administer the Campaign Reform Fund. Our reading of Proposition 68 fails to disclose any mention of an appointed receiver, and the Center has not referred us to any provision in Proposition 68 that provides for such an appointment. Instead, Proposition 68 expressly sets up a mechanism for receiving and disbursing the Campaign Reform Funds with specific tasks assigned to specified state officers: (1) Revenue and Taxation Code section 18775, as added by Proposition 68, in conjunction with Revenue and Taxation Code section 18554, assigns the duty of collecting the $3 of tax liability to the Franchise Tax Board; (2) section 85503, as added by Proposition 68, assigns the FPPC the task of certifying that candidates are eligible to receive Campaign Reform Fund moneys; and (3) section 85505, as added by Proposition 68, provides the state Controller shall disburse the certified amounts of the Campaign Reform Fund to the participating candidates. Thus, the notion of appointing a receiver to handle the Campaign Reform Fund envisioned by Proposition 68 is illusionary; *Showalter* is simply inapposite. We also find the reasoning of *People* v. *Crosby* (1956) 141 Cal.App.2d 172 [296 P.2d 438], in which the court held the statute covered estate funds held by a public administrator in his official capacity, and of *People* v. *Griffin* (1959) 170 Cal.App.2d 358 [338 P.2d 949], in which the court held the statute covered

bail money, more on point and for the purposes of this case more persuasive than *Showalter* (126 Cal.App. 665) or *Johnson** (Cal. App.).

### B.

Our finding of an irreconcilable conflict between Propositions 68 and 73 with respect to public funding of campaigns is also bolstered if we apply the traditional rules of statutory interpretation to the measures. ■ The rules of construction apply equally to the interpretation of initiative measures enacted as statutes as they do to the interpretation of statutory enactments. (*Sanders* v. *Pacific Gas & Elec. Co.* (1975) 53 Cal.App.3d 661 [126 Cal.Rptr. 415].) ■ "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ In ascertaining the will of the Legislature, "[t]he court turns first to the words themselves for the answer. It may also properly rely on extrinsic aids . . . . Primarily, however, the words, in arrangement that superimposes the purpose of the Legislature upon their dictionary meaning, stand in immobilized sentry, reminders that whether their arrangement was wisdom or folly, it was wittingly undertaken and not to be disregarded. [¶] . . . If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citations.]" (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1].)

■ With these well-established rules in mind, we can consider the measures as they appeared in the ballot pamphlet and were presented to the voters. Prior to the circulation of an initiative measure, the state Attorney General is required to prepare a title and summary of its "chief purpose and points"—not exceeding 100 words. (Cal. Const., art. II, § 10, subd. (d); Elec. Code, §§ 3502, 3503.) The Attorney General's statement must be true and impartial, and not argumentative or likely to create prejudice for or against the measure. (Elec. Code, § 3531.) Section 88002, subdivision (a), provides that in the state ballot pamphlet, the title of each state measure, as well as the official summary prepared by the Attorney General, must appear at the top portion of the first page of the ballot pamphlet concerning the measure.

As stated above, Proposition 68 was presented to the voters at the June 1988 election. In the state ballot pamphlet for the June 1988 election, the following title appears at the top portion of page 12: "68[.] Legislative

---

*See Reporter's Note, *ante*, page 1482.

Campaigns. Spending and Contribution Limits. Partial Public Funding. Initiative Statute"

The Attorney General's official summary for Proposition 68 states in pertinent part: "Establishes Campaign Reform Fund to which individuals may designate up to $3 annually from income taxes. . . . Summary of Legislative Analyst's estimate of net state and local government fiscal impact: Annual revenue loss from tax return designation to Campaign Reform Fund is estimated at $9 million starting in 1988-89. . . . Any surplus state campaign funds which exceed $1 million after the November general election will go back to the state's General Fund."

Proposition 73 also was presented to the voters in the June 1988 election. In the state ballot pamphlet for the June 1988 election, the following title appears at the top portion of page 32: "73[.] Campaign Funding. Contribution Limits. Prohibition of Public Funding. Initiative Statute"

The Attorney General's official summary for Proposition 73 states in pertinent part: "Prohibits public officials using and candidates accepting public funds for purpose of seeking elective office."

The language used in the official titles and summaries of the measures is plain with respect to (1) creating a system of partial public funding for legislative campaigns in Proposition 68 and (2) a ban on the use of public funds for all campaigns in Proposition 73. ▮▮▮▮ Nor have we discerned any ambiguity or uncertainty in the language of the texts of the two measures with regard to this issue.[10] Therefore, we conclude our finding of an irreconcilable conflict between the two measures on this issue is supported by the fundamental rules of construction as applied to the text of the two measures and to the official title and summary that appeared in the ballot pamphlet.

---

[10] The Center also recites various campaign arguments made during the June 1988 election campaign concerning the two measures to support a related contention it raises: "The intent of the electorate in adopting Propositions 68 and 73 is not irreconcilable, but is to enact both the voluntary fund of Proposition 68 and the prohibition on taxpayer mandatory funding of 73." It is unnecessary for us to address this contention since the correct standard is whether the two measures are in irreconcilable conflict, not whether the intent of the electorate in enacting two different measures was conflict-laden. Ascertaining the intent of the electorate through extrinsic aids, such as the official arguments for and against the measure in the state ballot pamphlet can, of course, be a proper tool in interpreting a measure if the language of the measure is uncertain. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) But here the pertinent language of the measures is clear, so we need not look beyond it to the extrinsic campaign arguments recited by the Center to determine electorate intent.

## C.

The Center contends the tax check-off system established by Proposition 68 is functionally analogous to the present system, which allows a taxpayer to divert up to $25 of a tax refund to a political party and receive a 25 percent tax credit the following year. (See Rev. & Tax. Code, § 17053.14.)[11] In essence, the Center characterizes Proposition 68 as a tax check-off system in which the taxpayer gets a tax credit the same year rather than the following year. However, the existing tax credit scheme reduces tax liability, which the Proposition 68 tax check-off system would not. Thus, within the context of the Proposition 73 public funding prohibition, the two systems clearly differ as to basic methodology affecting whether public moneys are in fact expended. Unlike the Proposition 68 tax check-off system, the state forwards a portion of a tax refund to a designated political party at a taxpayer's direction. The refund has already become personalty belonging to the taxpayer. There is no violation of Proposition 73's prohibition of the use of public moneys. Further, the credit received by the taxpayer the following year involves no expenditure of public moneys received or held within the meaning of Penal Code section 426, but merely reduces the taxpayer's liability for total tax due. Although the result of both systems is to reduce available tax revenue, the current system involves no expenditure of public moneys proscribed by Proposition 73.[12]

## II

The Center also faults the FPPC for (1) adopting a staff analysis that was erroneous as a matter of law, (2) acting ultra vires in purporting to resolve a conflict between two statutes, which is a judicial function, and (3) committing an abuse of discretion by finding an irreconcilable conflict without substantial supporting evidence in the record. ■ There is no need for us to address the first point; our task here is to resolve an alleged conflict between two statutes and determine if one should be cancelled, and as such our review is de novo. (See *People* ex rel. *Fund American Companies* v. *California Ins. Co.* (1974) 43 Cal.App.3d 423 [117 Cal.Rptr. 623].) With respect to the second point, there is likewise no need to address it. Assum-

---

[11] The current system also permits a taxpayer to voluntarily contribute up to $25, or jointly with one's spouse up to $50, to a political party in the California Election Campaign Fund even where there has been no overpayment of income tax, simply adding it to the amount of tax due.

[12] It is noteworthy the current system was neither addressed nor referenced by the drafters, the supporters, or the opponents of Proposition 73 in the Primary Election Ballot Pamphlet for June 7, 1988, the summary prepared by the Attorney General, the analysis of the Legislative Analyst, the text of the initiative measure or the arguments in favor and in rebuttal to opposition arguments.

ing arguendo that the FPPC acted ultra vires (but see §§ 83111 and 83114), the issue of conflict between the two measures is before us now for resolution. The third point is also without merit. The issue is a matter of law, not one of fact; thus the substantial evidence test is not relevant. However, even if it were, again the conflict issue is now before us for resolution so we need not address any purported abuse of discretion by the FPPC.

One final point needs brief mention. Amicus California Common Cause, in briefs also adopted by the Center, argues that section 85300, as added by Proposition 73, is unconstitutional because it, as a legislative enactment, cannot properly limit the appropriations power of future legislatures. The Center has informed this court that the constitutional issue is now pending before the Third District in *California Common Cause* v. *Fair Political Practices Commission et al.* (No. C005458). In light of the fact this constitutional issue has not been briefed by all parties appearing before us, we express no view on it.

### Disposition

Peremptory writ denied; alternative writ is discharged.

Work, Acting P. J., and Nares, J., concurred.

Petitioners' application for review by the Supreme Court was denied August 17, 1989.