[No. B042250. Second Dist., Div. Two. Feb. 2, 1990.]

DIANE WATSON et al, Plaintiffs and Appellants, v.
FAIR POLITICAL PRACTICES COMMISSION et al., Defendants
and Respondents.

[No. B041680. Second Dist., Div. Two. Feb. 2, 1990.]

DIANE WATSON et al., Plaintiffs and Respondents, v.
RULES COMMITTEE OF THE SENATE, Defendant and Appellant.

**COUNSEL**

Browne & Woods, Allan Browne, Benjamin D. Scheibe and Robert B. Broadbelt for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Burke, Williams & Sorensen, Leland C. Dolley, Robert V. Wadden, James R. Felton, Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen and Charles C. Marson as Amici Curiae on behalf of Plaintiffs and Appellants and Plaintiffs and Respondents.

Bion M. Gregory, Jack I. Horton, James L. Ashford and Mark Franklin Terry for Defendant and Appellant.

Kathryn E. Donovan, Scott Hallabrin, John G. McLean and Jeevan Ahuja for Defendants and Respondents.

Ronald A. Zumbrun and Anthony T. Caso as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**COMPTON, Acting P. J.**—In two separate actions, plaintiffs, consisting of several state legislators, their constituents, and other elected officials, initiated suit against the Rules Committee of the California State Senate and the Fair Political Practices Commission (FPPC), challenging the constitutionality of one portion of an initiative measure dealing with political reform, Proposition 73, adopted at the June 1988 primary election.

Article IV, section 3 of that measure amended Government Code[1] section 89001 to read as follows: "No newsletter or other mass mailing shall be sent at public expense."

Although the trial court initially found the newly amended statute to be unconstitutional, it reversed its position in a subsequent action brought to enforce the original judgment. Since the appeals from these conflicting rulings involve similar issues and parties, we have consolidated the cases for purposes of our review.[2]

We have concluded that the statute neither interferes with the Legislature's authority to govern its internal affairs nor burdens the exercise of any fundamental right. We therefore reverse the judgment of the trial court which declared section 89001 to be unconstitutional, and affirm the court's subsequent ruling upholding the validity of the statute.

---

[1] All further references are to the Government Code unless otherwise indicated.

[2] We initially denied plaintiffs' request to consolidate the appeals in the instant cases pending our review of the issues raised here. Having had an opportunity to examine in full the briefs of the parties, as well as the record in both cases, we have elected to consolidate the appeals in Nos. B041680 and B042250.

The facts giving rise to this litigation are undisputed by the parties and may be summarized as follows.

Prior to its amendment by Proposition 73, former section 89001 prohibited the mailing of newsletters and other mass mailings by or on behalf of any elected officer to a constituent or potential constituent but *only after* the elected officer had filed either "[t]he nomination documents . . . for any local, state, or federal office to be voted upon at an election governed by Chapter 5 . . . of Division 6 of the Elections Code" or "[t]he last document necessary to be listed on the ballot as a candidate for any local, state or federal office to be voted upon at an election not governed by Chapter 5. . . ."[3]

Following the enactment of that statute, the state Legislature developed extensive "newsletter programs" which involved expenditures from the contingent funds of both the Senate and Assembly for the publication and distribution of mass mailings from legislators to their constituents and other members of the public.

The "Revised Senate Newsletter Rules" (Rules), effective December 1984, set forth the purpose of the program as follows: "The Senate Newsletter Program is conducted by the Senate Rules Committee. The purpose of the program is to inform and educate, through direct mail communication the citizens of the state by discussion of the legislative issues, problems, and suggested solutions that are being dealt with in Sacramento. . . . [¶] The Newsletter Program is designed to inform citizens about past, present and future legislative events, as well as provide constituent assistance. . . . [¶] No mailing may be designed or used for 'political purposes.' "

In keeping with this statement of intent, the Rules contained various restrictions on the format of the newsletters, their substantive content, and the frequency of the mailings. The Rules further required that all proposed mailings be submitted to the rules committee for approval of both form and

---

[3] Former section 89001 was enacted as part of the Political Reform Act of 1974, also an initiative measure. It was amended by the Legislature in 1987 to provide as follows: "No newsletter or other mass mailing shall be sent at public expense by or on behalf of any elected officer to any person residing within the jurisdiction from which the elected officer was elected, or to which he or she seeks election, after the elected officer has filed either of the following:

"(a) The nomination documents, as defined in Section 6489 of the Elections Code, for any local, state, or federal office to be voted upon at an election governed by Chapter 5 (commencing with Section 6400) of Division 6 of the Elections Code.

"(b) The last document necessary to be listed on the ballot as a candidate for any local, state, or federal office to be voted upon at an election not governed by Chapter 5 (commencing with Section 6400) of Division 6 of the Elections Code."

content before being distributed. The Rules Committee of the Assembly promulgated similar rules for its members.

Both before and after the adoption of former section 89001, legislators and other elected officials, at both the state and local level, used publicly funded mass mailings to send a wide variety of written materials to their constituents. According to plaintiffs these mailings have been used by legislators to "address issues and legislation of special concern to their individual districts and of general concern to the state as a whole, to inform constituents of the activities of their elected representatives and of state government as a whole, to solicit views and comments from their constituents, to mobilize support for, or opposition to, proposed legislation, and to provide information concerning laws, regulations, and various governmental programs."

Based upon the total cost of the state newsletter program, the legislative analyst estimated in 1988 that the adoption of Proposition 73's prohibition against mass mailings by state elected officials would result in savings of approximately $1.8 million annually. Similar savings were also expected at the local level.

Against this backdrop, a majority of the electorate approved Proposition 73's limitation on publicly funded newsletter programs at the June 1988 primary election.[4] Unlike the bulk of statutes enacted by the measure, however, the amended version of section 89001 became effective the day following its passage.[5] (See Cal. Const., art. II, § 10, subd. (a).)[6]

Immediately thereafter, the Senate Rules Committee began rejecting requests from senators to send, at public expense, newsletters, questionnaires, and miscellaneous material to their constituents, and other members of the public.

In July 1988, several state senators, including plaintiffs Diane Watson, Bill Greene, and Art Torres, and six of their constituents, initiated an action in Los Angeles Superior Court (case No. C691676) against the Rules

[4] The measure also established limits on campaign contributions for all candidates for state and local elective offices and prohibited the use of public funds for campaign expenditures. (See § 85100 et seq.; see also *Center for Public Interest Law* v. *Fair Political Practices Com.* (1989) 210 Cal.App.3d 1476 [259 Cal.Rptr. 21].)

[5] Proposition 73 also amended section 82041.5 by redefining the term "mass mailing" as used in section 89001. Section 82041.5 now provides: " 'Mass mailing' means over two hundred substantially similar pieces of mail, but does not include a form letter or other mail which is sent in response to an unsolicited request, letter or other inquiry."

[6] The majority of statutes adopted following the passage of Proposition 73 became operative on January 1, 1989. (§ 85104.)

Committee seeking a declaration that section 89001 was unconstitutional. Various other state and local elected officials, including members of the Los Angeles City Council, later intervened in that action as plaintiffs. Assembly Member Ross Johnson, one of the authors of Proposition 73, and Mark Pickens, a nonincumbent seeking election to the Legislature, intervened as defendants.

Plaintiffs subsequently filed a motion for summary judgment, arguing in part that the statute infringed on the state Legislature's authority to govern its internal affairs and control the budget and appropriations process. Plaintiffs further maintained that the newly amended law burdened the exercise of several fundamental rights guaranteed by the First and Fourteenth Amendments to the federal Constitution, and that Proposition 73 itself violated the California Constitution's "single-subject" rule.

In February 1989, after hearing extensive argument by the parties, the trial court granted summary judgment in favor of plaintiffs declaring section 89001 "unconstitutional and of no force or effect." Defendants subsequently filed their appeal from that judgment.[7]

Following entry of judgment, the FPPC[8] informed the Legislature that, under the authority of section 3.5, article III of the California Constitution, it would continue to enforce section 89001 until it had been declared unconstitutional by an appellate court.[9] As a result, the Senate Rules Committee rejected all requests for publication and distribution of newsletters and other mass mailings pending the outcome of the appeal.

Plaintiffs thereafter sought relief by the filing of a petition for mandate and/or prohibition. Although Division Three of this court summarily denied the request for relief, its order suggested that plaintiffs initiate an action in superior court for injunctive relief against the FPPC.

Plaintiffs subsequently filed a new and separate complaint (case No. C722189) seeking to enjoin the FPPC from enforcing section 89001 and any interpretative regulations based thereon.

---

[7] Defendants in intervention later abandoned their appeal, leaving the Senate Rules Committee as the sole appellant in case No. C691676.

[8] Under section 83111, the FPPC has "primary responsibility for the impartial effective administration and implementation" of the Political Reform Act of 1974 and all amendments thereto.

[9] Article III, section 3.5 states in relevant part: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power:

"(a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional; . . ."

Several months earlier, in December 1988, the FPPC adopted regulation 18901[10] as a means of implementing section 89001. That rule, effective April 12, 1989, essentially provided that newsletters and other mass mailings were *not* prohibited under the statute so long as they did not "feature" (i.e., "single[ ] out for attention of the reader") any particular elective officer and were not "sent at the request of any elected officer or his or her agent." The regulation further permitted the mailing of press releases to the media, intra-agency communications, legal notices, announcements of official agency events and other public meetings, telephone directories, and documents "sent in connection with the payment or collection of funds" by a governmental agency, including tax bills and checks.

Plaintiffs took the position that the FPPC in promulgating regulation 18901, had impermissibly rewritten section 89001 by creating numerous exceptions and exclusions not authorized by the clear wording of the statute. At the hearing on plaintiffs' motion for a preliminary injunction, the trial court disagreed and ruled that when read in context of its placement in the Government Code and construed according to the FPPC interpretive regulation, the statute was constitutional. The request for injunctive relief was denied. Plaintiffs now appeal from that order.

■ In reviewing plaintiffs' challenge to the constitutionality of the statute, we do not consider or weigh the economic or social wisdom or general propriety of the initiative measure before us. Our sole function is to evaluate section 89001, and the FPPC's interpretive regulation, in light of established constitutional standards. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281].)

As emphasized by our Supreme Court when confronted with a similar task, " 'all presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.' (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204]; *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; *Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].)" (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814-815 [258 Cal.Rptr. 161, 771 P.2d 1247].)

These principles have particular application to enactments that are the product of the initiative process. ■ The courts of this state have often

---

[10] Regulation 18901 appears in title 2, division 6 of the California Code of Regulations. The full text of the regulation is set forth in the appendix to this opinion.

described the initiative and referendum as articulating one of the most precious rights of our democratic process. " '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' [Citations.]" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; see also *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46]; *Farley* v. *Healey* (1967) 67 Cal.2d 325, 328 [62 Cal.Rptr. 26, 431 P.2d 650]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 812 [270 P.2d 481].)

■ " ' "The words [of an initiative] must be read in a sense which harmonizes [them] with the subject-matter and the general purpose and object of the amendment, consistent of course with the language itself. The words must be understood, not as the words of the civil service commission, or the city council, or the mayor, or the city attorney, but as the words of the voters who adopted the amendment. They are to be understood in the common popular way, and, in the absence of some strong and convincing reason to the contrary, not found here, they are not entitled to be considered in a technical sense inconsistent with their popular meaning." ' [Citation.] To ascertain the intent of the electorate it is, of course, proper to consider the official statements made to the voters in connection with propositions of law they are requested to approve or reject. [Citations.]" (*Creighton* v. *City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1018 [207 Cal.Rptr. 78].)

■ Bearing in mind the foregoing interpretive aids, we turn first to plaintiffs' argument that the amended version of section 89001 usurps the state Legislature's constitutional and statutory authority to govern its internal affairs.

Article IV, section 7, subdivision (a) of the California Constitution directs that "[e]ach house shall choose its officers and adopt rules for its proceedings." Plaintiffs maintain that section 89001 violates this exclusive mandate by interfering with various statutory enactments and house rules which allow a contingency fund for legislative expenses (see § 9126),[11] pro-

---

[11] Section 9126 provides: "Unless specifically exempted from this section, all appropriations for contingent expenses of the Senate and legislative committees thereof, including appropriations previously made which have not reverted to the General Fund, shall be deposited in and credited to the Senate Contingent Fund, which fund is created in the State Treasury. The money in the fund shall be available for the expenses of the Senate and legislative committees thereof, and shall be disbursed under or pursuant to the direction of the Senate as provided in the rules, orders, and resolutions of the Senate, or as provided by the Senate Committee on Rules (which committee has a continuing existence during sessions and between sessions

vide for the rules committee to determine how expenditures from that fund are allocated, and establish a newsletter program for legislators to communicate with their constituents.

As we see it, however, section 89001 does not attempt to regulate the manner in which the Legislature drafts its rules, appropriates its funds, or chooses its officers. The statute merely limits the Legislature's ability to utilize *public funds* for mass mailings to constituents and other members of the public. The mere labeling of the "newsletter program" as an internal procedure of the Legislature does not make it so.

While there can be no question that both the Senate and the Assembly possess the power to create and administer their own internal affairs, it does not strike us that the newsletter program in either house falls within the exclusive sway of the rulemaking process. These programs extend far beyond the halls of the Legislature and impact virtually every citizen of this state.

The rulemaking authority is limited to the internal workings of the Senate and Assembly and does not encompass matters which are addressed to the world outside the Legislature. We cannot agree with plaintiffs that section 89001 constitutes an impermissible attempt at rulemaking by the electorate. It is, instead, a valid effort by which the electorate seeks to control the allotment of limited state revenues and reform the electoral process. Said another way, the use of taxpayers' funds to pay for mass mailings by state legislators is not insulated from external control by article IV, section 7.

The limitations provided for in section 89001 are substantially different from the initiative measure struck down in *People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316 [226 Cal.Rptr. 640], a case upon which plaintiffs principally rely. There, the court held that the Legislative Reform Act of 1983, a statutory initiative measure, was violative of article IV, section 7 because it attempted to regulate the Legislature's adoption of rules, its selection of officers and employees, and the appointment of committee members. That measure also established, among other things, a formula for the Legislature's budget and sought to repeal section 9126, the statute granting the Senate Rules Committee the authority to disburse monies from the contingent fund. In declaring the majority of the act unconsti-

with such powers, duties and responsibilities as the Senate from time to time shall prescribe) as and when thereunto authorized by the Senate. The money in the fund shall be disbursed pursuant to, and the powers, duties and responsibilities of the Senate Committee on Rules shall be as provided by, the rules, orders and resolutions adopted by the Senate at the 1949 Regular Session until modified or superseded by Senate action at a subsequent session."

tutional, the court observed that "the people through the electorate have been given the power to make statutes, i.e., the power to make *laws* for all the people, but not the power to make rules for the selection of officers or rules of proceeding or rules which regulate the committees or employees of either or both houses of the Legislature. These powers . . . are exclusively the province of the houses affected by them." (*People's Advocate, Inc.* v. *Superior Court, supra*, at p. 326, italics in original.)

Unlike the initiative measure at issue in *People's Advocate,* section 89001 does not attempt to regulate any of the proceedings of either the Senate or Assembly, but merely restricts individual members from using public funds to send self-aggrandizing newsletters.

We agree with the FPPC that the term "proceedings" as used in article IV, section 7, subdivision (a) does not refer to activities engaged in by individual legislators, but rather to activities by which the Legislature as a whole conducts its business. *People's Advocate* does not hold otherwise.

It is hyperbole to say that an initiative which merely prohibits legislators from spending public funds on mass mailings somehow strangles the legislative process as a whole. We take judicial notice of the fact that the state Legislature has not ceased functioning because of the passage of Proposition 73 in June 1988 or its enforcement by the FPPC. The Legislature has continued to fulfill its constitutional obligations.

Plaintiffs nevertheless insist that the statute interferes with the Legislature's power to budget and appropriate money under article IV, section 12 of the California Constitution.[12] That argument, however, misses the point. Section 89001 as written places no limitation whatsoever on the Legislature's authority to appropriate funds for its internal operations. It merely curbs individual legislators from using public funds to finance mass mailings to their constituents. Again, *People's Advocate, Inc.* v. *Superior Court, supra,* 181 Cal.App.3d 316 is inapposite. Under section 89001, the Legislature, as pertains to its internal operations, retains full control over the budget process and may continue to appropriate monies for such purposes as it sees fit. As to the other types of appropriations, article IV, section 12 does not operate to restrict the initiative process set forth in article II, section 8 and which vests the electorate with a power equal to that of the Legislature to enact laws. (Cf. art. II, § 9, subd. (a); see also *Bd. of Osteopathic Examiners* v. *Riley* (1923) 192 Cal. 158 [218 P. 1018]; *Carlson* v.

---

[12] Article IV, section 12 provides in relevant part:

" . . . . . . . . . . . . . . . . .

"(e) The Legislature may control the submission, approval, and enforcement of budgets and the filing of claims for all State agencies."

*Cory* (1983) 139 Cal.App.3d 724 [189 Cal.Rptr. 185].) Moreover, since the prohibition contained in section 89001 may be amended by statutory initiative or by referendum (see §§ 81012, 85103), the Legislature is not divested of its authority to enact future legislation within its competence. (See Castello, *The Limits of Popular Sovereignty: Using the Initiative Power to Control Legislative Procedure* (1986) 74 Cal.L.Rev. 491 499, fn. 44.) We decline to follow any suggestion to the contrary in *People's Advocate, Inc.* v. *Superior Court, supra,* 181 Cal.App.3d at pages 328-329.

■ Citing a vast array of state and federal cases, plaintiffs next assert that section 89001 violates numerous fundamental constitutional rights held by them as both elected representatives and as members of the electorate. Despite their broad assertion of such rights, plaintiffs have failed to identify any constitutional right to send newsletters and other mass mailings at public expense.

Although some of the federal "franking" privilege cases cited by plaintiffs refer to a legislator's "constitutional duty to communicate with and inform their constituents on public matters" (*Common Cause* v. *Bolger* (D.D.C. 1982) 574 F.Supp. 672, 677; see also *Bowie* v. *Williams* (E.D.Pa. 1972) 351 F.Supp. 628, 631; *Hoellen* v. *Annunzio* (7th Cir. 1972) 468 F.2d 522), none hold that the public *must* finance such communications.

For the most part, these cases dealt with whether Congress's *statutorily* granted franking privilege (see 39 U.S.C. § 3210) was unconstitutional, or whether it had been abused by the mailing of various types of literature to members of the public. That is not the issue before us.

Assuming arguendo that there exists a constitutional duty for legislators to communicate with the electorate on matters of public concern and a corollary right of the electorate to receive such communication, the United States Supreme Court has made it clear that so long as a legislative act is not aimed primarily at suppression of speech the failure "to subsidize the exercise of [such] right does not infringe [that] right." (*Regan* v. *Taxation with Representation of Wash.* (1983) 461 U.S. 540, 549 [76 L.Ed.2d 129, 139, 103 S.Ct. 1997].)

We are not here concerned with an enactment that seeks to control the content nor suppress any particular communication between individual legislators and their constituents. The statute does not contain a wholesale prohibition against legislators communicating with their constituents nor does it prevent public officials from receiving information from the electorate on matters of general concern. The principle articulated in *Regan*

squarely applies to section 89001's limitation against the use of public funds to finance mass mailings by state legislators.

Were the "duty" of a legislator to communicate and the corresponding "right" of members of the electorate to receive such communication equated with the freedom of speech as protected by the First Amendment, the question would immediately arise as to how that right would be enforced and by whom. What form of communication and with what frequency would discharge the duty or satisfy the right. In our opinion there is no such duty or right which can truly be said to enjoy constitutional protection in the manner urged by plaintiffs.

Plaintiffs further contend that limitation of section 89001 impermissibly burdens the rights to freedom of association, to vote, to petition the government for redress of grievances, and to instruct or recall elected representatives.

This overly broad assertion is merely makeweight in an endeavor to establish that somehow an elected official's constituents possess an absolute right to receive newsletters and other such communications at public expense.

We are further told that the statute's prohibition against publicly financed mass mailings "improperly dilutes and interferes with the meaningful exercise of constitutional rights because it prevents those rights from being exercised in a fully informed and effective manner." None of the cases cited by plaintiffs, however, support the proposition that they advance here.

The "Bill of Rights," as established in the first 10 amendments to the Constitution, simply bars governmental interference with those rights. It contains no guaranty that the government will monetarily subsidize the exercise of that right.

The statute in question neither seeks to "muzzle" elected officials nor impede the free flow of ideas between the electorate and the Legislature. It in no way diminishes the ability of any class of voters from exercising their right to vote, from petitioning the government, or from otherwise making their beliefs known to their elected representatives.

■ Having found that the statute has no real or appreciable impact on any right guaranteed by the state and federal Constitutions, we must also reject plaintiffs' contention that section 89001 be declared invalid unless its proponents demonstrate that it serves a compelling state interest and that it is narrowly drawn to achieve that end.

That form of analysis is generally reserved for those instances where the contested regulation impacts directly on the content of some restricted communication or directly interferes with the fairness and integrity of the electoral process. (See *Canaan* v. *Abdelnour* (1985) 40 Cal.3d 703, 710-713 [221 Cal.Rptr. 468, 710 P.2d 268, 69 A.L.R.4th 915]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 670 [122 Cal.Rptr. 377, 536 P.2d 1337]; *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 952 [104 Cal.Rptr. 297, 501 P.2d 537]; see also *Common Cause* v. *Bolger, supra*, 574 F.Supp. 672, 680-681.) Here, there is no such impact.

The ballot arguments in favor of and in opposition to the enactment of Proposition 73, in addition to the impartial appraisal of the measure by the legislative analyst, makes it clear that the initiative as a whole sought to reform the electoral process, at least in part, by prohibiting the public subsidy of political campaigns by incumbent officeholders and their challengers alike. As a means of implementing that goal, the measure imposed restrictions on campaign contributions (see §§ 85200-85202 and 85301-85305), limited honoraria (see § 85310), prohibited candidates for public office from using state revenues in their election campaigns (see § 85300), and circumscribed the use of mass mailings by elected officials (§ 89001).

Even a cursory review of these provisions makes it manifest that the majority of the electorate who voted for Proposition 73 intended to control the conduct of both incumbents and those seeking public office by restricting the use of public funds. Section 89001 in particular appears to be directed at removing at least some of the substantial advantages enjoyed by incumbent office holders over their challengers.[13] This objective is, of course, in keeping with that portion of the Political Reform Act of 1974 which declares: "Laws and practices unfairly favoring incumbents should be abolished in order that elections may be conducted more fairly." (§ 81002, subd. (e).)

The statute at issue here helps in accomplishing that goal by prohibiting elected officials from using public moneys to perpetuate themselves in

---

[13] There can be little doubt that an incumbent politician possess a significant "edge" over his or her challengers. This point was emphasized in *Common Cause* v. *Bolger, supra*, 574 F. Supp. at page 677, where the court observed: "[I]t stands to reason that incumbency alone is a valuable asset to the public official who seeks reelection. An incumbent Member of Congress enjoys a certain 'visibility' among his constituents that a challenger may find difficult or impossible to match. It is also beyond argument that any communication with constituents, whether through local meetings or through the mail or mass media, contributes to such visibility and thus may have a direct effect (however slight) in influencing the outcome of an election. To the extent that the effect is positive from the incumbent's standpoint, it is undoubtedly detrimental to his challenger's position. This is so whether the communication is part of an overt campaign effort or made simply in the normal course of a member's representative function."

public office. The legitimacy of such an objective is made clear by the Supreme Court's observation in *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 217 [130 Cal.Rptr. 697, 551 P.2d 1]: "A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office [citations]; *the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process.*" (Italics added.)

We are convinced that section 89001, by denying elected officials of all political persuasions the advantage of using public funds to put or keep their name before the voters, advances the legitimate state interest in avoiding "arbitrary preferment of one candidate over another by reason of incumbency." (*Gould* v. *Grubb, supra,* 14 Cal.3d 661, 677.) We also think it clear that the initiative serves the very legitimate aim of conserving limited state revenues by prohibiting the use of public funds for essentially political purposes. These twin goals of the statute constitute a permissible, if not significant, governmental interest.

■ Plaintiffs maintain, however, that even if section 89001 advances a compelling interest its scope is too broad to withstand constitutional scrutiny. In support of that argument, plaintiffs insist that the general wording of the statute not only prohibits the distribution of legislative newsletters, but all other forms of mass mailings by the government as well. We disagree.

Such an interpretation conflicts with the clear intent of the initiative measure as a whole. Nothing in Proposition 73 could have led the electorate to believe that the adoption of the measure would result in a total ban on all mass mailings, including legal notices, tax bills, sample ballots, and college catalogs. As previously discussed, *supra,* the initiative sought specifically to reform the political process by prohibiting the public subsidy of political campaigns and by attempting to limit some of the advantages enjoyed by incumbent office holders.

Any contrary interpretation would result in the repeal of countless statutes and regulations that require the mailing of various notices and other documents by governmental agencies. We seriously doubt that the electorate intended such a result by passing Proposition 73. In reaching this conclusion we are, of course, guided by the well-settled rule that "[t]he literal language of enactments may be disregarded to avoid absurd results and to

fulfill the apparent intent of the framers." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 245.)

In any event, regulation 18901, promulgated by the FPPC in exercise of the duties imposed upon it by the Political Reform Act of 1974 (see § 83112), clarifies any ambiguity that may exist in the practical application of the statute. Such regulations are deemed valid so long as they are " 'consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.' ([§ 11342.2].)" (*Consumer Union of U.S., Inc.* v. *California Milk Producers Advisory Bd.* (1978) 82 Cal.App.3d 433, 447 [147 Cal.Rptr. 265].)

Contrary to the argument advanced by plaintiffs, the FPPC has not rewritten section 89001, but has merely interpreted it in a manner consistent with the intent of the electorate in adopting Proposition 73.

In keeping with the spirit of the initiative, the regulation merely precludes the public funding of newsletters which feature any particular legislator or other elected official by name. It does not prohibit legislative committees and the like from using state revenues to disseminate information to the public as deemed necessary. We agree with the FPPC that the effect of regulation 18901 is to permit the free flow of necessary government information while reducing the political benefit realized by incumbent elected officials from the sending of newsletters and other such mass mailings. This is totally consistent with the FPPC's duty to implement the *intent* and not the *literal language* of the statute.

■ Lastly, we consider plaintiffs' contention that Proposition 73, by including within its provisions the prohibition at issue violated the single-subject requirement of article II, section 8, subdivision (d) of the California Constitution. That provision declares, "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."

■ In determining whether a measure embraces more than one subject, our Supreme Court has held on more than one occasion that " 'an initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, *all of its parts are "reasonably germane"* to each other,' and to the general purpose or object of the initiative. [Citations.]" (*Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 245 [186 Cal.Rptr. 30, 651 P.2d 274], italics in original; see also *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, 37-43; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 229-232; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-92 [207 P.2d 47].) In a more recent discus-

sion of the issue, the court emphasized that initiatives encompassing a wide range of diverse measures may withstand challenge so long as their provisions are "either functionally related to one another or are reasonably germane to one another or the objects of the enactment." (*Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1100 [240 Cal.Rptr. 569, 742 P.2d 1290]; see also *California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351, 358 [245 Cal.Rptr. 916].)

■ We conclude that the amendment of section 89001 was directly related to the overall aim of Proposition 73. There is a reasonable connection between the prohibition of publicly financed mass mailings by elected officials and the reformation of the political process. No further discussion is warranted.

Plaintiffs, however, see something sinister in the fact that neither the ballot title ("Campaign Funding. Contribution Limits. Prohibition of Public Financing.") nor the ballot arguments contain a direct reference to the ban on mass mailings at public expense. For obvious reasons, article II, section 8, subdivision (d) does not expressly require that *every* subject of an initiative be stated in its title. (*Harbor* v. *Deukmejian, supra,* 43 Cal.3d at p. 1098; *California Trial Lawyers* v. *Eu, supra,* 200 Cal.App.3d at p. 358; see also *Evans* v. *Superior* (1932) 215 Cal. 58, 62-63 [8 P.2d 467].) Nevertheless, that portion of Proposition 73's title which declares one of the purposes of the initiative to be "Prohibition of Public Financing" directly relates to the amendment of section 89001.

We also note that in *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, the Supreme Court found that the Political Reform Act of 1974, the initiative measure which Proposition 73 amended, did not violate the single-subject rule. Included within the provisions of that wide ranging act was former section 89001 which itself prohibited the use of public funds for mass mailings under certain conditions. Those conditions were simply geared to the situation where an incumbent has openly declared an intent to stand for reelection. It would be the ultimate in naiveté to suggest that no incumbent can be considered to be seeking reelection until such time as he or she is required to openly declare such intent. Proposition 73 simply changes the time frame in which the already established prohibition is to operate.

The essence of plaintiffs' argument is that the electorate, in approving Proposition 73 and its ban on publicly funded newsletters and other mass mailings by elected officials, simply did not realize what it was doing because of the way in which the initiative was worded or because of the placement of the measure's operative provisions.

When Proposition 73 is considered in light of the political and social milieu that existed at the time of its adoption, we are convinced that the voters were not deluded into believing that the measure was something that it was not. The majority that voted for the reforms promised by the initiative undoubtedly concluded that existing methods of campaign financing had been unsuccessful in bringing a measure of equality and fairness to the political process.

These measures received widespread publicity, some more than others, and were hotly debated in the media. In light of the attention that was focused on this initiative in the days and weeks preceding the election, we cannot presume that the people did not know what they were about in approving the measure.

"As succinctly and graphically expressed a number of years ago in a study of the California procedure, '. . . the initiative is in essence *a legislative battering ram* which may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end. Virtually every type of interest-group has on occasion used this instrument. It is deficient as a means of legislation in that it permits very little balancing of interests or compromise, but it was designed primarily for use in situations where the ordinary machinery of legislation had utterly failed in this respect. It has served, with varying degrees of efficacy, as a vehicle for the advocacy of action ultimately undertaken by the representative body.' (Key & Couch, The Initiative and the Referendum in Cal. (1939) p. 485, italics added.)" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d 208, 228-229.)

Although we express no opinion as to the wisdom or utility of Proposition 73 and the amendment of section 89001, we find no constitutional or legal barrier which would prevent the electorate from prohibiting the use of state revenues to fund the publication and distribution of newsletters and other mass mailings by elected officials. Simply put, section 89001 passes constitutional muster.

The judgment in case No. C691676 declaring section 89001 unconstitutional is reversed, and the order in case No. C722189 denying injunctive relief is affirmed. All parties to bear their own costs on appeal.

Gates, J., and Fukuto, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 26, 1990.

APPENDIX

(Regulations of the Fair Political Practices Commission,
Title 2, Division 6 of the California Code of Regulations)

18901. Mass Mailings Sent at Public Expense

(a) Except as provided herein, a newsletter or other
mass mailing is "sent at public expense" within the meaning of
Government Code Section 89001 if any of the costs of design,
production, printing or distribution, is paid for with public
moneys as defined in Government Code Section 85102(e).:

(b) A newsletter or other mass mailing is not
prohibited by Government Code Section 89001 if it contains only
information or material sent in response to unsolicited specific
requests contained in written correspondence (including petitions)
or oral inquiries received by the elected officer or by an agency
with which the officer is affiliated.

(c) Except as otherwise provided in this section, a
newsletter or other mass mailing may not be sent within the mean-
ing of Government Code Section 89001 if:

(1) The name of the elected officer or his or her
photograph appears on the document; and

(A) The elected officer exercises direction
or control over the content, production, or
distribution of the document, or

(B) The document is sent at the request or
suggestion of the elected officer or his or her
agent; or

1 18901

(C) The document is signed by, or is designated as being from, the elected officer or his or her office; or

(2) (A) The elected officer is affiliated with the agency which produces or distributes the document; and

(i) The elected officer is featured in the document; or

(ii) The name, office or other reference to the elected officer or his or her photograph appears on the document and the document is prepared or sent in cooperation, consultation, coordination or concert with the elected officer.

(B) An elected officer is "featured" in a mass mailing if he or she is singled out for attention of the reader by use of his or her signature, inclusion in any photograph, or the manner of display of his or her name or office in the layout of the document such as by headlines, type size, or typeface.

(C) An elected officer is "affiliated with an agency" if he or she is a member, officer, or employee of the agency or a subunit such as a committee, or has supervisory control over the agency, or appoints one or more members of the agency.

2 18901

(d) A newsletter or other mass mailing is not prohibited by Government Code Section 89001 if the total number of pieces sent is less than the number specified in Government Code Section 82041.5 in any calendar month. In making this determination, pieces which are not prohibited pursuant to subdivision (f), shall not be counted.

(e) A newsletter or other mass mailing is not prohibited by Government Code Section 89001 if it meets all of the following criteria:

(1) The stationery, forms and envelopes used for the mailing are the standard stationery, forms and envelopes of the agency or committee of the agency; and

(2) The name of an elected officer who is affiliated with the agency or committee appears in the standard letterhead or logotype of the stationery, forms or envelopes of the agency, a committee of the agency, or the elected official and the newsletter or mass mailing is not otherwise prohibited under subdivision (c) because of additional references to the elected officer.

As used in this subdivision, the term "letterhead or logotype" includes a listing of agency or committee officials or members, in which all who are listed appear in the same typeface and type size and location in the layout of the newsletter or other mass mailing.

As used in this subdivision, the term "standard letterhead or logotype" refers to any regularly used by the agency, subunit or the elected officer. Provided, however, that where a

3 18901

newsletter does not use the agency's standard stationery letterhead, a roster listing containing the names of all elected officers in the agency may be used in the newsletter in place of the agency's standard stationery letterhead.

(f) The following newsletters or other mass mailings are not prohibited by Government Code Section 89001 if the mailing is sent to the persons specified in each instance below and the mailing consists of:

(1) Press releases sent to members of the media;

(2) Mailings sent in the normal course of business from one governmental entity or officer to another governmental entity or officer;

(3) Intra-agency communications sent in the normal course of business to employees, officers, deputies and other staff;

(4) Mailings sent in connection with the payment or collection of funds by the agency, including tax bills, checks and similar documents, and any use of the official's name, office, title or signature is necessary to the collection or payment of the funds;

(5) Mailings sent by an agency responsible for administering a government program to persons subject to that program when such mailings are essential to the functioning of the program;

(6) Legal notices and other mailings sent as required by law, court order or order adopted by an administrative agency pursuant to the Administrative

4 18901

Procedure Act and any use of the elected officer's name, office, title or signature is required in the notice or other mailing;

(7) Telephone directories, organization charts, and other similar listings or rosters which include the names of elected officers as well as other individuals in the agency, where the name of each individual listed appears in the same type size and typeface;

(8) Mailings sent to the elected officer's constituents which directly relate to that elected official's incumbent governmental duties and which solely include the time, date, place, and a concise description of the subject matter of a public meeting to be held by the elected officer;

(9) Agendas and other writings required to be made available pursuant to Sections 11125.1 and 54957.5 of the Government Code; or

(10) Announcements of the time, date, place, and subject matter of official agency events which include a listing of elected officers and others who will participate in the events.

(g) A newsletter or other mass mailing is "sent" within the meaning of Government Code Section 89001 only if it is distributed by one of the following means:

(1) United States Postal Service;

(2) Any commercial delivery service;

(3) Agency personnel or agents of the agency;

(4) Volunteer delivery mechanisms.

(5) Paid advertisement in any subscription publication such as a newspaper of general circulation.

(6) Electronic mail communications.

(h) As used in this regulation, "unsolicited" specific request means a communication which is not requested or induced by the recipient elected officeholder or any third person acting at his or her behest. Information requested in response to an elected officer's participation at a public forum or press conference or issuance of a press release shall not be considered "solicited." A specific request which is otherwise "unsolicited" to receive an agency newsletter or mass mailing on an ongoing basis, shall not be deemed "solicited" by the fact that the requestor responds to an agency notice indicating that, absent response, his or her name will be purged from the mailing list for that newsletter or mass mailing.

Absent a specific, explicit request for further information or mailings, receipt of written correspondence, a petition, or an oral communication is not deemed to be a "specific request." A specific request for continuing information on a subject shall be considered a request for multiple responses directly related to that subject. A request to receive a regularly published agency newsletter shall be deemed to be a "specific request" for each issue of that newsletter.

However, written correspondence, or a petition or oral inquiry to an officeholder on a subject or on several subjects,

6 18901

with no specific request for a reply, will be deemed to be a specific request for a single written response to that written correspondence, petition or oral inquiry.

Members of the public who come to an agency's offices or to a meeting and who pick up materials for themselves will be deemed to have made an unsolicited specific request for those materials.

Paid subscription members of an electronic mail service will be deemed to have made an unsolicited request for the communications provided by that service.

(i) (1) Pieces of mail are "substantially similar" if their text is substantially the same, with only minor changes or alterations for purposes of personalizing the piece of mail.

(2) Form letters, or newsletters in which only the addressee information is changed, are "substantially similar."

(3) Individualized checks, tax forms, tax refunds, tax notices, and similar pieces of mail which are based upon individual information such as records, filings, holdings, or applications are not "substantially similar" pieces of mail. Any use of the elected

officer's name, office, title or signature must be essential to the piece of mail.

(Gov. Code Sections 82041.5, 89001)

History: (1) New Section filed 10/18/77; effective 11/17/77.
 (2) Amendment filed 10/29/81; effective 11/28/81.
 (3) Amendment filed 12/27/82; effective 1/26/83.
 (4) Amendment filed as emergency 8/8/88; effective immediately. Expires 12/6/88.
 (5) Readopted as emergency 12/6/88; effective immediately. Expires 4/8/89.
 (6) Certificate of compliance filed 3/13/89; operative 4/12/89.